# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DOUGLAS JONES, | **MEMORANDUM DECISION AND ORDER** |
| Plaintiff, | |
| v. | |
| CAROLYN W. COLVIN, | Case No. 1:12-CV-00153-EJF |
| Acting Commissioner of Social Security, | |
| Defendant. | Magistrate Judge Evelyn J. Furse |

Plaintiff Douglas Jones filed this action asking the Court[1] to reverse or remand the final agency decision denying him Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, *see* 42 U.S.C. §§ 401–434, and denying him Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, *see* 42 U.S.C. §§ 1381–1383f .  The Administrative Law Judge ("ALJ") determined Mr. Jones did not meet the eligibility standards for benefits because he did not have "a disability within the meaning of the Social Security Act from March 1, 2007, through the date of [the ALJ's] decision."  (Admin. R. Doc. 20, certified copy tr. of R. of admin. proceedings: Douglas Jones (hereinafter "Tr. __").)  Having carefully considered the parties' memoranda and the complete record in this matter,[2] the Court AFFIRMS the Commissioner's decision.

---

[1]  On October 31, 2012, in accordance with 28 U.S.C. sections 636(c)(1) and (3) and Federal Rule of Civil Procedure 73, the parties consented to proceed before the undersigned Magistrate Judge.  (*See* ECF No. 11.)

[2]  Pursuant to Civil Rule 7-1(f) of the Rules of Practice for the United States District Court for the District of Utah, the Court concludes it does not need oral argument and will determine the appeal on the basis of the written memoranda.

# FACTUAL AND PROCEDURAL HISTORY

On March 17, 2008, Mr. Jones filed for DIB and SSI alleging an onset date of disability of March 1, 2007. (Tr. 19.) The Regional Commissioner denied Mr. Jones's claim on July 18, 2008, (Tr. 103–04), and again, upon reconsideration on April 8, 2009. (Tr. 105–06, 115–20.) On May 29, 2009, Mr. Jones requested a hearing before an ALJ. (Tr. 121–22.) The hearing before the ALJ took place on June 17, 2010, (Tr. 46–102), and the ALJ issued a decision on October 14, 2010, finding Mr. Jones did not qualify as disabled within the meaning of the Social Security Act. (Tr. 16–45.) On November 22, 2010, Mr. Jones requested the Appeals Council review the ALJ's decision. (Tr. 167–74.) The Appeals Council denied Mr. Jones's request for review on May 7, 2012, (Tr. 1–5), making the ALJ's decision the Commissioner's final decision for purposes of judicial review under 42 U.S.C. section 405(g). *See* 20 C.F.R. § 404.981.

## I.    Medical History

Mr. Jones has a long history of back pain with periods of improvement due to lifestyle changes. (Tr. 289–90, 292.) For many years other ailments have also affected Mr. Jones's health including numbness in his right leg, headaches, (Tr. 289), hepatitis C, (Tr. 325–31, 407), diabetes, (Tr. 307–09), and symptoms related to gastroesophageal reflux disease ("GERD"). (Tr. 295–98, 307–09.)

To treat his back pain, Mr. Jones visited E. Alan Jeppsen, M.D., monthly between March 2006 and May 2008. (Tr. 335-360.) Mr. Jones also complained during that same period of headaches, and Dr. Jeppsen noted various forms of anxiety, depression, and mood disorders. (*Id.*) During a visit to Dr. Jeppsen on March 1, 2007, Mr. Jones's alleged disability onset date, Mr. Jones continued to complain about his back pain and frequent headaches. (Tr. 353.) On March 26, Dr. Jeppsen gave Mr. Jones early refills of his pain medications because Mr. Jones

complained his new job required him to lift 50 pound bags, which aggravated his back pain. (Tr. 352.) During his April visit with Mr. Jones, Dr. Jeppsen noted Mr. Jones was "having problems at work with the physical demands" and that "[h]e is looking for another job." (Tr. 351.) On May 21, Dr. Jeppsen noted that Mr. Jones had quit his job due to his back pain and because his employer "wouldn't give him lunch or breaks." (Tr. 350.) Dr. Jeppsen refilled his pain medications but noted a "[n]eed to taper meds while unemployed." (*Id.*)

Mr. Jones remained unemployed between June and August 2007, and during that time Dr. Jeppsen did not note any significant change in Mr. Jones's condition except for varied frequency or intensity of his headaches. (Tr. 345–49.) Dr. Jeppsen did not note a change in Mr. Jones's back pain and headaches during his September visit with Mr. Jones but did record Mr. Jones reported "hunting for a job trying to find one that won't injur[e his] back. (Tr. 346.) In October 2007, Dr. Jeppsen increased Mr. Jones's prescription of Amitriptyline from 25 mg to 50 mg. (Tr. 345.) Dr. Jeppsen noted on November 9, that Mr. Jones's overall pain intensity had decreased and that Mr. Jones "would be starting a new job today doing sales at Radio Shack." (Tr. 344.) During his December visit with Dr. Jeppsen, Mr. Jones described his back pain as severe but also reported that his overall pain had decreased. (Tr. 343.) Dr. Jeppsen also noted that Mr. Jones was unemployed again because his job "didn't work out." (*Id.*)

Between January and March 2008, Mr. Jones continued his monthly visits with Dr. Jeppsen. (Tr. 339–42.) During these visits Dr. Jeppsen noted that Mr. Jones's back pain had decreased but that the pain duration remained the same and that Mr. Jones continued to suffer from headaches. (*Id.*) On March 11, Mr. Jones began receiving treatment at the Health Clinics of Utah, and Michelle Hicks, FNP-C examined him. (Tr. 362, 365.) Then on April 7, Dr. Jeppsen noted Mr. Jones's "[p]ain localization has changed" and that in some areas the intensity

and duration of his back pain had gotten worse.  (Tr. 337-38.)  During Mr. Jones's last visit with Dr. Jeppsen on May 2, Dr. Jeppsen noted Mr. Jones's "[p]ain localization has changed" and that the intensity of the pain in his lower back had gotten worse.  (Tr. 335–36.)

On April 30, 2008, a radiologist took a magnetic resonance imaging ("MRI") of Mr. Jones's back.  (Tr. 371–72.)  On May 9, Nurse Practitioner Hicks reviewed the April 30 MRI and found it "demonstrate[d] some broad-based disk bulges and protrusions at all levels with some facet changes as well as some mild narrowing."  (Tr. 363.)  She then sent the MRI to a neurosurgeon for further evaluation to determine if Mr. Jones might benefit from surgery.  (Tr. 362.)  On June 3, a radiologist, Christopher Penka, M.D., examined Mr. Jones and found he had "resolving L5 radiculopathy on the right" and "residual weakness in the L5 innervated muscles on the right."  (Tr. 377–79.)  Dr. Penka reviewed the April 30 MRI and found Mr. Jones had "broad-based disk protrusion at L4–L5 and perhaps slightly more on the right than the left," "no extruded disk fragment," and "no obvious herniated nucleus pulposus."  (*Id.*)  Based on his examination of Mr. Jones, Dr. Penka did not recommend surgery because Mr. Jones "improved compared to the way he was [four] months ago" but did recommend "conservative management . . . involv[ing] medication, physical therapy, and potential for epidural steroid injections."  (*Id.*)

On July 2, 2008, Marilyn Cox, ANP-BC, examined Mr. Jones who complained about high blood sugar levels related to his diabetes, continued back pain, and abdominal pain.  (Tr. 425.)  Nurse Practitioner Cox prescribed Mr. Jones Ultram, referred him for epidural injections, and ordered an abdominal ultrasound.  (*Id.*)  The results of the abdominal ultrasound showed "[t]he liver is echogenic consistent with fatty infiltration."  (Tr. 408.)  On July 17, Mr. Jones began receiving physical therapy from Cheryl A. Wheelwright, P.T., to treat his back pain and regularly received therapy through October 16.  (Tr. 455–67, 512–13.)  In a letter dated April 30,

2009, Ms. Wheelwright summarized Mr. Jones's eleven physical therapy sessions: "[Mr. Jones] worked very hard in his exercises in therapy and did all that was asked of him, but physical therapy did not decrease his pain. It did increase his mobility and strength a little, but did not really improve his function." (Tr. 512.)

On July 23, 2008, Robert B. Lamb, M.D., examined Mr. Jones and reviewed an MRI of Mr. Jones's back which showed he "has a spinal canal which is below average in size and are [sic] bulging disc at multiple levels including a protruding disc at L4–L5 on the right." (Tr. 409–10.) On August 7, Mr. Jones followed up with Nurse Practitioner Hicks complaining of numbness in his left groin and increased back and neck pain. (Tr. 420–21.) Mr. Jones told Ms. Hicks he wanted injections for his neck pain and to have another radiologist examine him and review the April 30 MRI. (*Id.*) Ms. Hicks prescribed Ultram and ordered labs because Mr. Jones also complained of abdominal pain possibly related to his hepatitis C. (*Id.*) On August 11, Dr. Lamb gave Mr. Jones his first epidural steroid injection, (Tr. 411–12), and on August 15, Mr. Jones had a stress test because he had suffered periods of chest pain. (Tr. 413–17.) Garry W. Mackenzie, M.D., performed adenosine cardiolite and nuclear cardiac stress tests on Mr. Jones and advised him to review the results with Ms. Hicks. (*Id.*)

On October 14, 2008, Ronald G. Duerksen, M.D. performed an electromyographic ("EMG") examination because Mr. Jones complained of "[p]aresthesias in both upper limbs"; the examination yielded normal results. (Tr. 485–86.) On November 24, Deborah Judd, FNP-C, examined Mr. Jones who complained of low back pain and neck pain, cluster migraines, fatigue, GERD, and insomnia. (Tr. 470–72.) Ms. Judd recommended he follow up on his hepatitis C and "be evaluated with an endoscopy for his GERD." (*Id.*) On December 30, Dennis Sobotka, M.D., performed an upper endoscopy on Mr. Jones that showed "Barrett's esophagus" and "no

dysplasia." (Tr. 478–84.) On January 14, 2009, Mr. Jones followed up on the results of the endoscopy with David W. Fairbanks, M.D., who recommended he avoid milk, take antacids containing magnesium, and "elevate the head of his bed four inches." (Tr. 469.) Dr. Fairbanks also advised Mr. Jones to follow up with a cardiologist and gastroenterologist. (*Id.*)

On February 26, 2009, Richard Grow, Ed.D., performed a psychological examination of Mr. Jones as part of his disability application. (Tr. 487–94.) Dr. Grow diagnosed Mr. Jones with opioid abuse in recent remission, dysthymic disorder, generalized anxiety disorder with provisional panic attacks, and sought to rule out personality disorder. (Tr. 493.) Dr. Grow also assigned Mr. Jones a global assessment of functioning ("GAF") score of 50 and opined Mr. Jones was "capable of understanding, remembering, and carrying out simple two-step instructions." (*Id.*)

The next day, February 27, Tyler Dixon, D.O., examined Mr. Jones who complained of low back pain and weakness in his legs. (Tr. 535–39.) Dr. Dixon noted Mr. Jones had good leg strength and a positive bilateral straight leg test. (Tr. 536.) Dr. Dixon prescribed several medications and instructed Mr. Jones to return in one month or follow up sooner if his pain changed in character or intensity. (*Id.*) Nearly two months later, on April 27, Mr. Jones returned to Dr. Dixon complaining of fatigue, low back pain, and erratic blood sugar levels. (Tr. 530–32.) In a letter dated April 29, 2009, Dr. Sobotka stated Mr. Jones's fatigue could result from his hepatitis C, which he may want to begin treating. (Tr. 511.)

Several months later, on October 2, 2009, Mr. Jones again visited Dr. Dixon complaining his headaches were worse in the morning and anticipation of morning headaches caused him to feel anxious each night before going to bed. (Tr. 527–29.) Dr. Dixon prescribed Mr. Jones Lyrica, a muscle relaxant, and a few doses of Lortab for occasional severe pain. (*Id.*) Mr.

Jones's symptoms had not changed when he visited Dr. Dixon on October 27, and Dr. Dixon "felt [he] had little to offer [Mr. Jones]" besides the medication he had already prescribed. (Tr. 524–26.) On January 12, Dr. Sobotka performed an esophagogastroduodenoscopy ("EGD") on Mr. Jones that showed a small hiatel hernia and erythematous mucosa in the gastroesophagel junction and lower third of the esophagus. (Tr. 555.) Dr. Dixon reiterated his position to Mr. Jones that he could only offer him medication during a visit on January 19. (Tr. 577–79.) On January 25, 2010, Dr. Lamb administered epidural steroid injections to Mr. Jones's back. (Tr. 569–70.) On February 3, a radiologist performed an abdominal ultrasound on Mr. Jones, which showed a lesion on his liver. (Tr. 552–53.)

On February 8, 2010, Mr. Jones followed up on the epidural steroid injection with Dr. Dixon who noted minimal improvement of Mr. Jones's back pain and "worsening muscle spasms on the left side." (Tr. 566–68.) Dr. Dixon increased Mr. Jones's Roxicodone prescription to manage his pain and instructed him to return in three months, or sooner, if his symptoms did not improve. (*Id.*) A few days later on February 10, a radiologist performed a "Hepatobiliary ecintigraphy with intravenous CCK" procedure on Mr. Jones that indicated "[b]orderline low gallbladder ejection fraction . . . . indicative of biliary dyskinesia or chronic cholecystitis . . . . [and] [m]oderate quantity of biliary enterogastric reflux." (Tr. 563.)

## II.    Disability Assessments

In a letter dated May 13, 2008, Nurse Practitioner Hicks opined, after reviewing old medical records and studies she ordered, that Mr. Jones cannot "work primarily related to his back pain and associated radicular symptoms involving his lower extremities," but she could not predict how long his pain and symptoms would continue to present problems. (Tr. 362.) On July 18, 2008, Lewis J. Barton, M.D., completed a Physical Summary and Physical Residual

Functional Capacity ("RFC") Assessment of Mr. Jones as part of Mr. Jones's DIB and SSI claims. (Tr. 392–401.) Dr. Barton noted Mr. Jones's neck exam was normal, he had a right foot drop from a herniated disc at L4-5 that was resolving, and he could perform light work.[3] (Tr. 393.) On March 11, 2009, Rox Burkett, M.D., reviewed Mr. Jones's medical evidence, considered new evidence, and agreed with Dr. Barton's initial assessment. (Tr. 495–96.)

On April 30, 2009, Dr. Dixon opined that Mr. Jones's chronic low back pain, hepatitis C, diabetes, and high cholesterol makes work difficult but that "his ability to work could be reviewed every couple of years" and that in the future "[h]e may benefit from some vocational rehab." (Tr. 514.)

On October 18, 2009, Dr. Dixon completed a form medical statement regarding his assessment of Mr. Jones's back pain, diabetes, headaches, and hepatitis C. (Tr. 516–18.) Dr. Dixon attested Mr. Jones had a positive straight leg raising test and found that he suffered from neuro-anatomic distribution of pain, motor loss, inability to perform fine and gross movements effectively, inability to ambulate effectively, limitation of motion of the spine, sensory or reflex loss, severe burning or painful dysesthesia, chronic nonradicular pain and weakness, and type II diabetes. (Tr. 516.) Dr. Dixon also indicated Mr. Jones suffers from daily migraine and muscle tension headaches lasting one to two hours during which he cannot work. (Tr. 517.) Further, Dr. Dixon found Mr. Jones suffers from significant peripheral neuropathy, chronic pain syndrome with pain that ranges from severe to extreme, and that his pain causes marked restrictions of

---

[3] Dr. Barton's Physical RFC Assessment of Mr. Jones contained exertional limitations including occasional lifting and/or carrying up to twenty pounds, frequent lifting and/or carrying up to ten pounds, and standing and/or walking six hours in an eight-hour workday, sitting for about six hours in an eight-hour workday; postural limitations including occasional climbing, balancing, stooping, kneeling, crouching, and crawling; and an environmental limitation to avoid concentrated exposure to extreme cold. (Tr. 395–98.)

daily living activities, marked difficulty maintaining social functioning, and concentration, persistence, or pace deficiencies. (*Id.*) Finally, Dr. Dixon indicated Mr. Jones can occasionally lift five pounds but otherwise cannot perform any work-related physical tasks including sitting or standing. (Tr. 518.)

On April 6, 2010, Dr. Sobotka attested in a medical statement that Mr. Jones's Hepatitis C caused fatigue, weakness, and endocrine changes. (Tr. 551.) Dr. Sobotka opined Mr. Jones could work two hours per day, stand for periods of thirty minutes at a time, occasionally lift twenty pounds, and frequently lift five pounds. (*Id.*)

Lastly, on April 26, 2010, Richard Hall, M.D., who according to the administrative record only treated Mr. Jones once prior for a finger injury, (Tr. 590–91), completed a form medical statement similar to the medical statement Dr. Dixon completed, but Dr. Hall's assessment differed from Dr. Dixon's in several ways. (Tr. 593–95.) Dr. Hall limited Mr. Jones's condition to neuro-anatomic distribution of pain, positive straight leg raising test, type I diabetes, fatigue and weakness, need to change position more than once every two hours, motor loss, and limitation of motion of the spine. (Tr. 593.) Similar to Dr. Dixon's medical statement, Dr. Hall indicated Mr. Jones suffers from daily migraine and muscle tension headaches during which he cannot work, but he found the headaches lasted several hours rather than one to two hours. (*Cf.* tr. 594, *with* tr. 517.) Further, Dr. Hall found Mr. Jones suffers from significant peripheral neuropathy, chronic pain syndrome with severe pain, and that his pain causes marked restrictions of daily living activities, marked difficulty maintaining social functioning, and concentration, persistence, or pace deficiencies. (Tr. 594.) Finally, although Dr. Hall indicated

Mr. Jones could perform several work-related physical tasks,[4] like Dr. Dixon, he also found Mr. Jones could not work.  (*Compare* tr. 595 *with* tr. 518.)

### STANDARD OF REVIEW

42 U.S.C. section 405(g) provides for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA").  The Court reviews the Commissioner's decision to determine whether the record as a whole contains substantial evidence in support of the Commissioner's factual findings and whether the SSA applied the correct legal standards.  42 U.S.C. § 405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  The Commissioner's findings shall stand if supported by substantial evidence.  42 U.S.C. § 405(g).

Adequate, relevant evidence that a reasonable mind might accept to support a conclusion constitutes substantial evidence, and "[e]vidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).  The standard "requires more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084. "Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotations marks and citations omitted).  Moreover, "[a] finding of 'no substantial evidence' will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence."

---

[4] Dr. Hall attested Mr. Jones can stand less than fifteen minutes at one time, stand and sit one hour respectively during a work day, occasionally rotate his neck left and right, occasionally elevate and bring his chin to neck, and frequently perform gross and fine manipulation with both hands.  (Tr. 595.)

*Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (internal quotation marks and citations omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases," the court "will not reweigh the evidence or substitute [its] judgment for the Commissioner's," *Lax*, 489 F.3d at 1084 (internal quotation marks and citations omitted), but "review only the *sufficiency* of the evidence," *Oldham v. Astrue,* 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original). The court need not accept the Commissioner's findings mechanically, but must "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met." *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks and citation omitted). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence,'" and the court may not "'displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

In addition to a lack of substantial evidence, the Court may reverse where the Commission uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards.  *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Thomson v. Sullivan*; 987 F.2d 1482, 1487 (10th Cir. 1993); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

## ANALYSIS

The Social Security Act ("Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover, the Act considers an individual disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-part sequential evaluation. *See* 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750–53 (10th Cir. 1988); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987). The analysis evaluates whether:

(1) The claimant presently engages in substantial gainful activity;
(2) The claimant has a medically severe physical or mental impairment or impairments;
(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which preclude substantial gainful activity;
(4) The impairment prevents the claimant from performing his or her past work; and
(5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his or her age, education, and work experience.

*See* 20 C.F.R. § 404.1520. The claimant has the initial burden of establishing the disability in the first four steps. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). At step five, the burden shifts to the Commissioner to show the claimant retains the ability to perform other work existing in the national economy. *Id.*

The ALJ continued to evaluate Mr. Jones's claim through step five, making the following findings of fact and conclusions of law with respect to Mr. Jones:

1. "[Mr. Jones] meets the insured status requirements of the Social Security Act through December 31, 2012." (Tr. 21.)

2. "[Mr. Jones] has not engaged in substantial gainful activity since March 1, 2007, the alleged onset date (20 C.F.R. 404.1571 *et seq*., and 416.971 *et seq*.)." (Tr. 22.)

3. "[Mr. Jones] has the following severe impairments: degenerative disc disease of the lumbar and cervical spine (with spinal stenosis), diabetes mellitus, hepatitis C, generalized anxiety disorder, and mood disorder (20 C.F.R. 404.1520(c) and 416.920(c))." (*Id*.)

4. "[Mr. Jones] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." (*Id*.)

5. "After careful consideration of the entire record, the undersigned finds that [Mr. Jones] has the residual functional capacity (RFC) to perform a range of light work as defined in 20 DFR 404.1567(b) and 416.967(b). [Mr. Jones] is able to lift and/or carry twenty pounds occasionally and ten pounds frequently. [Mr. Jones] must be allowed to shift positions between sitting and standing/walking at will, for his comfort, throughout the eight-hour work day. [Mr. Jones] may perform postural activities on an occasional basis. The claimant may use his upper bilateral extremities for overhead reaching only on an occasional basis, due to his cervical spine condition. Such work may not require [Mr. Jones]'s concentrated exposure to vibrations or rough, uneven surfaces. The claimant has moderate limitations (1/3 or less overall restriction) in his ability to understand and remember detailed instructions; his ability to carry out detailed instructions; his ability to maintain concentration and attention for extended periods; and, his ability to respond appropriately to changes in the work setting." (Tr. 26–27.)

6. "[Mr. Jones] is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965)." (Tr. 38.)

7. "[Mr. Jones] was born on June 22, 1965 and was 41 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963)." (*Id*.)

8. "[Mr. Jones] has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964)." (*Id*.)

9. "Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not [Mr. Jones] has transferable job skills (See SSR 82–41 and 20 C.F.R. Part 404, Subpart P, Appendix 2)." (*Id*.)

10. "Considering [Mr. Jones]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Mr. Jones] can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a))." (*Id.*)

11. "[Mr. Jones] has not been under a disability, as defined in the Social Security Act, from March 1, 2007, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g))." (Tr. 39.)

In short, the ALJ concluded Mr. Jones did not possess an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, that he had the residual functional capacity to perform a range of light work, and that he did not qualify as disabled as defined in the Act from March 1, 2007, the alleged onset date, through the date of the ALJ's decision. (Tr. 22–39.)

In support of his claim that this Court should reverse the Commissioner's decision, Mr. Jones argues the ALJ erred: (1) by failing to find Mr. Jones's headaches to constitute a severe impairment in combination with his other severe impairments; (2) by finding Mr. Jones not credible regarding the severity of his pain; (3) by giving no weight to the opinions of several treating physicians; and (4) by failing to determine Mr. Jones's RFC properly. The Court addresses each argument in turn.

## I.        Step Two Determination

Mr. Jones argues the ALJ erred when she failed to mention Mr. Jones's headaches and did not find his headaches a severe impairment in combination with his other severe impairments. (Pl.'s Opening Br. 17–18, ECF No. 15.) The Court disagrees.

Step two of the sequential evaluation process requires the ALJ to decide whether the claimant has a severe impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment or combination of impairments qualifies as severe when it significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). If the ALJ does not find at

step three that the claimant's impairment or impairments meets or equals a listing in appendix 1, the ALJ continues at step four to determine the claimant's RFC. 20 C.F.R. § 404.1520(a)(iii)–(iv). In determining RFC, the ALJ considers all medically determinable impairments, including non-severe impairments. 20 C.F.R. § 404.1545(a)(2). Because the ALJ considers both severe and non-severe impairments at later steps, any failure to designate additional severe impairments at step two qualifies as harmless if the ALJ finds at least one severe impairment and continues with the sequential evaluation process. *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008); *Brescia v. Astrue*, 287 F. App'x 626, 629 (10th Cir. 2008).

Here, the ALJ found at step two of the sequential evaluation process that Mr. Jones had severe impairments consisting of "degenerative disc disease of the lumbar and cervical spine (with spinal stenosis), diabetes mellitus, hepatitis C, generalized anxiety disorder, and mood disorder." (Tr. 22.) Having found that Mr. Jones possessed these severe impairments, the ALJ continued with the sequential evaluation process. (Tr. 22–39.) In determining Mr. Jones's RFC, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p" in addition to "opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (Tr. 27.) Specifically, the ALJ considered the cluster headaches and migraines. (Tr. 27, 28.) Because the ALJ found severe impairments at step two and continued the sequential evaluation process, any error at step two remains harmless.

## II.  Evaluation of Mr. Jones's Credibility

Next, Mr. Jones argues the ALJ failed to consider his pain properly in making the RFC assessment. (ECF No. 15 at 18–21.) However, Mr. Jones actually argues that no substantial

evidence supports the ALJ's determination regarding his credibility. (ECF No. 15 at 20–21.) The Court disagrees.

When evaluating credibility, the ALJ must follow the prescribed two-step process: (1) evaluate whether the claimant has an underlying medically determinable impairment one could reasonably expect to produce the claimant's pain or other symptoms; and (2) evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. *See Barnett v. Apfel*, 231 F.3d 687, 690 (10th Cir. 2000) (discussing factors to evaluate credibility). "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quotation omitted). The ALJ must cite specific evidence used in evaluating a claimant's subjective complaints, and if he finds those complaints incredible, he must explain why. *See id.* But this analysis "does not require a formalistic factor-by-factor recitation of the evidence." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). "So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, [the credibility determination requisites] are satisfied." *Id.*

The ALJ followed the prescribed two-step process for evaluating self-reported symptoms. First, she evaluated whether Mr. Jones had an underlying medically determinable impairment one could reasonably expect to produce pain or other symptoms; and second, she evaluated the intensity, persistence, and limiting effects of Mr. Jones's symptoms to determine the extent to which they limited his functioning. (*See* Tr. 27–29.) As to the first step, the ALJ found Mr. Jones's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 29.)

At step two, the ALJ found Mr. Jones's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's] residual functional capacity assessment." (Tr. 29.) Further, the ALJ found "[t]he medical records and other evidence do not support [Mr. Jones]'s allegation of disability," (*id.*), and cited specific medical evidence that undermines Mr. Jones's testimony. For example, the ALJ cited the medical expert, Michael F. Enright, Ph.D., who found inconsistencies between Mr. Jones's testimony of his illicit drug use and the medical records. (Tr. 30.) The ALJ also found Mr. Jones not credible because after he claims he became disabled he took a job that required him to lift fifty-pound bags, (tr. 30–31), and because his medical records indicated he only took his pain medication as needed and not everyday or as prescribed. (Tr. 34.) Because substantial evidence supports the ALJ's credibility finding, the Court will not disturb it.

### III.    Evaluation of Treating Physician Opinion Evidence

Mr. Jones argues the ALJ also erred because she gave no weight to the opinions of treating physicians Dr. Dixon, Dr. Hall, and Dr. Sobotka in making the RCF assessment. (ECF No. 15 at 22.) The Court disagrees.

When evaluating a treating physician's medical opinion, the ALJ must complete a two-step analysis. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). At the first step the ALJ must determine whether to give controlling weight to the treating physician's medical opinion. *Id.* (citation omitted). The ALJ should accord the opinion controlling weight "if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Id.* However, deficiency at step one does not automatically mean the ALJ should reject the opinion. *Id.* (citing SSR 96-2P). The second step requires the ALJ to explain clearly how much weight she gives to the opinion using

factors provided in the regulations. *Id*. at 1330-31. 20 C.F.R. section 404.1527(c) provides the factors the ALJ must consider at step two: "(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the" relevant evidence supports the physician's opinion; "(4) consistency between the opinion and the record as a whole; (5) whether" the physician specializes in the area upon which s/he renders an opinion; and "(6) other factors brought to the ALJ's attention [that] tend to support or contradict the opinion." *See Watkins v. Barnhart*, 350 F.3d 1297, 1300-01 (10th Cir. 2003) (internal quotation omitted). While the ALJ must explain the weight given to the opinion, the ALJ's decision need only provide "'sufficientl[] specific[ity] to make clear to any subsequent reviewers the weight [she] gave to the treating source's medical opinion and the reason for that weight.'" *Krauser*, 638 F.3d at 1331 (quoting *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004)).

Moreover, the ALJ's decision need not *discuss explicitly* all of the factors for each of the medical opinions. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (stating that a lack of discussion of each factor does not prevent the court from according the decision meaningful review). When considering medical opinion evidence, the ALJ must weigh and resolve evidentiary conflicts and inconsistencies. *See, e.g., Eggleston v. Bowen,* 851 F.2d 1244, 1247 (10th Cir. 1988) (reflecting ALJ's resolution of evidentiary conflicts between medical providers).

Here, after extensively considering all the medical records, (*see* tr. 29–36), the ALJ gave no weight to the opinions of Dr. Dixon, Dr. Hall, and Dr. Sobotka because the DIB and SSI processes reserve RFC determinations to the Commissioner, (tr. 36), and because their opinions

"are unsupported by the respective doctor's own rather minimal treatment records, by the great weight of credible evidence of record, and by [Mr. Jones]'s own acknowledged level of functioning." (Tr. 37.) Further, the ALJ questioned whether Dr. Hall constituted a treating physician since the medical record indicates Dr. Hall only treated Mr. Jones one time during the relevant period for a finger injury unrelated to Mr. Jones's alleged disabilities. (*Id.*)

Moreover, the ALJ provided additional reasons why she gave no weight to Dr. Dixon's April 2009 letter or his October 2009 form medical statement. The ALJ rejected Dr. Dixon's April 2009 letter because it "provided no function-by-function analysis" and because Dr. Dixon had only treated Mr. Jones one time before writing the letter. (Tr. 36.) Similarly, the ALJ rejected Dr. Dixon's form medical statement because he had only examined Mr. Jones three times prior to completing the form. (*Id.*)

Substantial evidence supports the ALJ's credibility determination as to these treating physicians' opinions. Mr. Jones does not provide the Court any evidence to the contrary, and the Court will not reweigh the evidence presented to the agency or substitute its judgment for the Commissioner's. *Lax*, 489 F.3d at 1084.

### IV.     Final RFC Determination

Lastly, Mr. Jones argues the ALJ erred in assessing his RFC with respect to his failed work attempts, Mr. Jones's impairments including his headaches, and the jobs identified by the vocational expert. (ECF No. 15 at 24, 26.) The Court disagrees.

The RFC reflects the ability to do physical, mental, and other work activities on a sustained basis despite limitations from the claimant's impairments. *See* 20 C.F.R. §§ 404.1545, 416.945. In determining the claimant's RFC, the decision maker considers all of the claimant's medically determinable impairments, including those considered not "severe." *See* 20 C.F.R. §

404.1545(a)(2).  Further, the ALJ must base RFC assessments on all relevant evidence in the record, not just the medical evidence.  20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); SSR 96-8p (July 2, 1996).

> This step four analysis involves three phases:
>
> In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC), and in the second phase, he must determine the physical and mental demands of the claimant's past relevant work.  In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one.  At each of these phases, the ALJ must make specific findings.

*Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (quoting *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996).

At phase one the ALJ stated she considered all symptoms and opinion evidence in determining Mr. Jones's RFC.  (Tr. 27.)  This Court takes the lower tribunal at its word.  *See Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (citation omitted).  Moreover, the Decision demonstrates the ALJ considered all of Mr. Jones's failed work attempts and all his impairments, including his headaches.

The ALJ thoroughly discussed Mr. Jones's work history and his testimony regarding his inability to retain those jobs.  (Tr. 28.)  The ALJ also considered Mr. Jones's testimony regarding his headaches and other impairments and, as discussed above, found his testimony not credible.  (Tr. 28–29.)  Further, the ALJ specifically discussed the objective medical evidence concerning Mr. Jones's headaches.  (Tr. 30, 34–36.)

The Court finds the ALJ took into account the entire record including Mr. Jones's failed work attempts and his physical limitations in determining Mr. Jones's RFC.  Substantial

evidence in the record supports the RFC finding, and the Court finds the ALJ did not err in assessing Mr. Jones's RFC.

At phase two and three the ALJ found Mr. Jones unable to perform his past relevant work because of "the requirement for a 'sit/stand' option in [Mr. Jones]'s current RFC." (Tr. 38.) If the claimant cannot perform past relevant work, the ALJ moves to step five using the RFC to determine if the claimant can perform any work available in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g). At this step, the ALJ must find the claimant disabled unless the Commissioner can establish "the claimant retains the capacity to perform an alternative work activity and that this specific type of job exists in the national economy." *Williams*, 844 F.2d at 751 (internal quotation marks and citation omitted); *see also* 20 C.F.R. § 404.1520(g).

Therefore, the ALJ consulted a vocational expert, (*see* tr. 89–100), who testified that based on the ALJ's hypothetical that included a sit/stand option, jobs existed in the national economy Mr. Jones could perform. (Tr. 94–96.) The ALJ found the vocational expert's testimony consistent with the RFC and the other factors she had to consider at step five of the evaluation process and found Mr. Jones not disabled. (Tr. 38–39.) Therefore, the Court finds the ALJ did not err at step five.

## CONCLUSION

Based on the foregoing, the Court AFFIRMS the Commissioner's decision because substantial evidence supports it.

DATED this 7th day of February, 2014.


BY THE COURT:


Evelyn J. Purse
United States Magistrate Judge